# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHARLES N. SHAFOR,                          Case No. 1:19-cv-860
     Plaintiff,                           Dlott, J.
                                            Litkovitz, M.J.
     vs.

COMMISSIONER OF                             **REPORT AND**
SOCIAL SECURITY,                            **RECOMMENDATION**
     Defendant.

Plaintiff Charles N. Shafor brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his application for disability insurance benefits ("DIB"). This matter

is before the Court on plaintiff's Statement of Errors (Doc. 12), the Commissioner's response in

opposition (Doc. 16), and plaintiff's reply memorandum. (Doc. 17).

## I. Procedural Background

Plaintiff filed his application for DIB in March 2016, alleging disability since March 14,

2016, due to Post Traumatic Stress Disorder ("PTSD"), explosive personality disorder, anxiety,

major depression disorder, paranoia, a nervous condition, suspiciousness and irritable bowel

syndrome. The application was denied initially and upon reconsideration. Plaintiff, through

counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ")

Noceeba Southern. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ

hearing on June 27, 2018. On October 12, 2018, the ALJ issued a decision denying plaintiff's

DIB application. This decision became the final decision of the Commissioner when the

Appeals Council denied review on August 16, 2019.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

2

(6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2020.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since March 14, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: affective disorder, anxiety, personality disorder, and posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: changes should be detailed and well-explained; avoid interaction with the public; occasional and superficial interaction with coworkers and supervisors; no tandem/side-by-side work; and work in a low stress job, defined as only occasional decision-making required and occasional changes in the work setting.
>
> 6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]

---

[1] Plaintiff's past relevant work was as an insurance salesman, a light, but performed as sedentary, skilled job; a sales representative, business proprietor, and general manager, all light, skilled jobs; and a machine operator, a medium, semi-skilled job.  (Doc. 7 at PAGEID 73, 102-103).

7. The [plaintiff] was born [in] ... 1970 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404 Subpart P. Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from March 14, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Doc. 7 at PAGEID 62-75)

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

---

[2] The ALJ relied on the VE's testimony to find that plaintiff would have been able to perform the requirements of approximately 390,000 unskilled, medium jobs in the national economy, such as laundry worker (200,000 jobs), hand packager (70,000 jobs); and order picker (120,000 jobs). (Doc. 7 at PAGEID 72, 104-105).

(1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).  *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.  Specific Error

On appeal, plaintiff alleges a single issue: that the ALJ erred in the evaluation of the medical source opinions.  Plaintiff argues that although "the record contains no treating source medical opinion," the ALJ failed to defer to the opinions of two examining doctors, Dr. Charles Walters and Dr. Taylor Groneck.  (Docs. 12, 17).  Plaintiff claims the ALJ's failure to defer to the medical source opinions constitutes "reversible error."  (Doc. 12 at PAGEID 526).

Plaintiff argues that the ALJ gave only "partial weight" to the opinion of Dr. Groneck without "explaining specifically which parts of the opinion were given weight and which were not."  (*Id*. at PAGEID 524).  Citing the ALJ's decision, plaintiff alleges the ALJ improperly

rejected the opinion of Dr. Groneck for two reasons: (1) "[T]he claimant indicated that his symptoms had been present for many years and that he worked skilled jobs, in management positions despite these symptoms," and (2) "Treatment records also show improvements in his symptoms with therapy. This evidence suggests that the degree of limitation experienced by the claimant is not as severe as Dr. Groneck opined." (Doc. 7 at PAGEID 72; Doc. 12 at PAGEID 524-525). Plaintiff contends that the ALJ's determination that he worked skilled jobs despite the presence of his symptoms "is poorly supported" because the record shows a "worsening of his symptoms" since he was last able to work. (Doc. 12 at PAGEID 525). Plaintiff also argues that the ALJ's determination that there was "improvement" in his therapy was unsupported by the evidence in the record. Plaintiff claims "there were significantly more periods of instability per his therapy records than stability." (*Id*. at PAGEID 527).

In response, the Commissioner alleges that the ALJ reasonably evaluated the medical opinions of Dr. Groneck and Dr. Walters and contends that the ALJ's determination is supported by substantial evidence. (Doc. 16 at PAGEID 548). The Commissioner alleges that plaintiff's argument amounts to a recitation of the evidence and a disagreement with how the ALJ weighed differing medical opinions. The Commissioner contends that this is not a basis to set aside the ALJ's factual findings. (*Id*.).

### 1. Medical evidence

In this case, no treating physician offered any medical opinions. Instead, the medical opinion evidence was offered by two non-examining agency consultants, Dr. Patricia Kirwin and

Dr. Tonnie Hoyle, a one-time examining consultant, Dr. Groneck, and Department of Veterans Affairs physicians Dr. Walters and Dr. Dharman Annadurai.[3]

On November 17, 2015, Dr. Walters, a psychiatrist at the VA, evaluated plaintiff and completed an Initial PTSD Disability Benefits Questionnaire. (*Id*. at PAGEID 314-321). Dr. Walters reported that plaintiff carried a PTSD diagnosis relating to his combat experience in the early 1990s. His claimed in-service stressor was related to his fear of hostile military or terrorist activity. Dr. Walters found that plaintiff's diagnoses of generalized anxiety disorder and major depressive disorder-single episode-unspecified are related to his PTSD. Dr. Walters concluded that plaintiff has total occupational and social impairment as evidenced by his difficulty getting along with people, difficulty sleeping which makes him sleepy during the day, irritability and anger outbursts, difficulty concentrating, and avoidance of public and crowded spaces. (*Id*. at PAGEID 320). The VA found plaintiff to be 100% disabled relating to his PTSD, which entitled him to VA benefits. (*Id*. at PAGEID 203-204).

Dr. Groneck consultatively evaluated plaintiff for disability purposes on June 11, 2016. (Doc. 7). Plaintiff was seeking disability because he had a "tough time working with others," experienced distrust of others, and slept poorly. (*Id*. at PAGEID 328). Plaintiff reported that he fought regularly with his wife because he was provoked easily and distrusted her. (*Id*. at PAGEID 329). Plaintiff also reported that his depressive symptoms began in 1990 following

---

[3] The medical evidence revealed that plaintiff suffered from gastroesophageal reflux disease and irritable bowel disease. (Doc. 7 at PAGEID 63; Exhs. 1F, 4F). Dr. Annadurai examined plaintiff in October 2015 in this regard. (*Id*. at PAGEID 321). The ALJ noted that these physical impairments did not cause functional impairment and the record did not support a finding that these impairments were "severe." (*Id*. at PAGEID 63-64, 71-72). The ALJ stated that "there is no evidence of more than minimal limitations in work-related functions resulting from claimant's physical impairments." (*Id*. at PAGEID 72). Plaintiff does not dispute the ALJ's finding concerning his physical impairments.

combat, but they worsened in his 30s.  (*Id*. at PAGEID 330).  Plaintiff stated that he left jobs

because he did not get along with coworkers or management.  (*Id*.).  On mental status

examination, Dr. Groneck found that plaintiff was quietly cooperative and rapport was difficult

to establish.  He was hesitant to engage and appeared visibly anxious and easily agitated.  (*Id*. at

PAGEID 331).  He "worked to hold back tears."  (*Id*.).  His facial expression was generally non-

expressive, his palms appeared sweaty, his voice was shaky, and he nervously scanned the room

and looked behind and around him while walking into the room.  (*Id*.).  He reported explosive

outbursts that he was unable to control.  (*Id*.).  Dr. Groneck opined that plaintiff did not appear to

minimize or exaggerate reported difficulties and that he appeared open, honest, and forthcoming.

(*Id*.).

       Dr. Groneck diagnosed plaintiff with unspecified depressive disorder with anxious

distress, intermittent explosive disorder, and chronic PTSD.  (*Id*. at PAGEID 332).  Dr. Groneck

opined that plaintiff was capable of understanding and remembering job instructions consistent

with an average range of intelligence and would likely work at a slower pace as a result of

concentration difficulties secondary to mood problems and anxiety.  (*Id*. at PAGEID 333).  He

"is expected to be frustrated by novel and demanding tasks."  (*Id*.).  He was apprehensive and

mistrustful during the evaluation and would likely have "significant difficulty" interacting

positively with others.  He could not have any role requiring customer service contact.  (*Id*.).  Dr.

Groneck also opined that plaintiff's ability to manage workplace pressures appeared

"significantly compromised by his mood symptoms, anxiety, and explosive outbursts."  (*Id*.).

According to Dr. Groneck, plaintiff is expected to require excessive support to adjust to changes

in working conditions. His symptoms may also prompt concern for the safety of others in the workplace. (*Id*.).

State agency psychologist, Dr. Kirwin, reviewed plaintiff's file in June 2016 and concluded that he was mildly restricted in activities of daily living; experienced moderate difficulties in maintaining social functioning; had moderate difficulties in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation of extended duration. (Doc. 7 at PAGEID 113). Dr. Kirwin opined that plaintiff is able to maintain attention for one to four step tasks consistently and five to six step tasks occasionally with no high pace or high production quotas; respond appropriately in a nonpublic or solitary work setting with occasional or intermittent interactions with co-workers and supervisors; and complete tasks with only occasional changes. (*Id*. at PAGEID 115-116). State agency psychologist, Dr. Hoyle, reviewed plaintiff's file upon reconsideration in October 2016 and affirmed Dr. Kirwin's assessment. (*Id*. at PAGEID 126-130).[4]

### 2. Weight to medical opinions

The Social Security regulations vest the ALJ with responsibility "for reviewing the evidence and making administrative findings of fact and conclusions of law." 20 C.F.R. § 404.1513a. In determining disability, the ALJ will consider the medical opinions in the case record along with the other relevant evidence. 20 C.F.R. § 404.1527(b) (citing 20 C.F.R. § 404.1520b). While physicians may render an opinion on a claimant's functional capacity, the ultimate responsibility for determining a claimant's capacity to work lies with the Commissioner.

---

[4] Plaintiff does not discuss the assessments by the state agency psychologists in his statement of errors. Plaintiff only states, in the abstract, that "the ALJ failed to defer to two consultative examining doctors and even the non-examining state agency psychologists." (Doc. 12 at PAGEID 524).

*See Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 728 (6th Cir. 2013) (the Commissioner is ultimately responsible for assessing a claimant's RFC).  *See also* 20 C.F.R. § 404.1546(c) (the responsibility for assessing a claimant's RFC at the administrative hearing level lies with the ALJ).  The ALJ is responsible for assessing a claimant's RFC based on all of the relevant medical and other evidence.  20 C.F.R. § 404.1545(a)(3).  This includes weighing the relevant medical opinions of record.  *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010).  *See also* 20 C.F.R § 404.1527(c)(2).

Under the treating physician rule, an ALJ must give "controlling" weight to the opinion of a claimant's treating physician if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record. . . ."  20 C.F.R § 404.1527(c)(2).  Where, as here, there are no treating physician opinions, the ALJ must weigh the opinions of the other medical sources in accordance with certain regulatory factors.  The opinion of a non-treating medical source is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(3)-(6).[5]  The opinion of a non-treating but examining source is generally entitled to more weight than the opinion of a non-examining source.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007); 20 C.F.R. § 404.1527(c)(1).

---

[5] These regulations have been amended for claims filed on or after March 27, 2017.  82 FR 15132-01, 2017 WL 1105368.  The amendments do not apply to plaintiff's claim, which he filed in 2016.

### a. Dr. Groneck's opinions

The ALJ gave partial weight to the opinions of Dr. Groneck, the consultative

psychologist.  The ALJ stated:

> Dr. Groneck's objective findings and the evidence as a whole demonstrates (sic)
> difficulties with social functioning and managing stressors.  However, the claimant
> indicated his symptoms had been present for many years and that he worked skilled
> jobs, in management positions despite these symptoms.  Treatment records also
> show improvements in his symptoms with therapy.  This evidence suggests that the
> degree of limitation experienced by the claimant is not as severe as Dr. Groneck
> opined.

 (Doc. 7 at PAGEID 72).

The ALJ's reasons for giving Dr. Groneck's opinions only partial weight are not

supported by substantial evidence.  First, the ALJ erred in summarily discounting Dr. Groneck's

opinions on the basis that treatment records showed "improvements in his symptoms with

therapy."  (Doc. 7 at PAGEID 72).  In the case of mental impairments, the Social Security

regulations recognize that a claimant's level of functioning may vary considerably over time and

that longitudinal evidence is helpful in evaluating the variations in functioning.  20 C.F.R. Pt.

404, Subpt. P, App. 1, 12.00(C)(5).  "Improvement" in the level of mental functioning is a

relative concept and is dependent on the base level from which the improvement is measured:

> Even if [a doctor's] use of the word "better" referred to Plaintiff's mood, this word
> did not provide the ALJ with substantial evidence from which to find that Plaintiff's
> mental impairment had subsided.  The ALJ made no inquiry into the degree of
> improvement, or from what baseline Plaintiff had improved.  Under the ALJ's
> logic, any improvement in one's mood, regardless of how small and from what
> level the individual improved, would defeat a claim of mental impairment.  This
> cannot be so.

*Boulis-Gasche v. Comm'r of Soc. Sec*, 451 F. App'x 488, 494 (6th Cir. 2011).

The ALJ here applied the reasoning which the Sixth Circuit rejected in *Boulis-Gasche*. The ALJ discounted Dr. Groneck's June 2016 assessment based, in part, on plaintiff's supposed improvement in therapy. However, the ALJ did not cite any findings or evidence to show the baseline from which plaintiff's condition had improved *or* the degree of improvement. Contrary to the ALJ's conclusion that plaintiff improved with therapy, the evidence of record appears to show that plaintiff's symptomology deteriorated or at least remained constant since Dr. Groneck's exam with few exceptions.

In June 2016, Dr. Groneck examined plaintiff and reported that plaintiff appeared visibly anxious, easily agitated, and fidgety during the evaluation. (Doc. 7 at PAGEID 331). He worked to hold back tears. His speech was slightly pressured, and he spoke with a loud, shaky tone of voice. (*Id.*). Dr. Groneck observed that plaintiff had excessive nervous energy, and he "nervously scanned the room and looked behind him and around him while walking into the room." (*Id.*). His attention and concentration skills were poor and limited by his agitation and anxiety. (*Id.*). Dr. Groneck also reported that plaintiff endorsed explosive outbursts that he was unable to control, anxiety, symptoms of PTSD (intrusive thoughts, flashbacks, nightmares, and vigilance), crying spells, low energy, insomnia, and significant social problems at work which had resulted in job terminations. (*Id*. at PAGEID 332). Dr. Groneck found plaintiff's self-reported data to be reliable. (*Id.*).

Plaintiff continued to display many of the same severe symptoms during his subsequent therapy sessions. During a psychosocial assessment with a social worker, Tonya Gragg-McCoy, LISW-S, at the VA in September 2016, plaintiff reported that he had difficulty coping with

anger, he had left multiple jobs due to interpersonal conflicts, and he reported feeling uncomfortable around people.  His stressors included sleeplessness, nightmares, difficulty concentrating, short term memory loss, anxiety and depression symptoms, suspiciousness, borderline paranoia, and social anxiety.  (Doc. 7 at PAGEID 495-500).

On January 18, 2017, plaintiff was seen by VA social worker Krista Porterfield-Spurling. Plaintiff reported his predominant symptoms were anxiety and rage, he easily became angry, and he continued to experience sleep problems.  He reported that he experienced nightmares every night.  Plaintiff also reported moderate depression, and Ms. Porterfield-Spurling noted that he became tearful several times during the session, especially when discussing his experience in the military.  He reported that he isolated himself and discussed the significant losses in his life, including that he and his wife had known about fifteen people who have committed suicide. Plaintiff also reported conflicts with his wife and twenty-year old daughter.  On mental status examination, plaintiff's mood was sad; his affect was tearful; his insight and judgment were within normal limits; and he denied suicidal and homicidal ideation.  Ms. Porterfield-Spurling diagnosed plaintiff with PTSD.  (*Id.* at PAGEID 480-481).

In his June 2017 psychotherapy session, plaintiff reported significant turmoil with his spouse.  Ms. Porterfield-Spurling reported that plaintiff continued to experience anxiety.  On mental status examination, his mood was euthymic yet anxious, his affect was animated, his insight and judgment were within normal limits and his speech was pressured at times.  (*Id.* at PAGEID 449).

13

During an August 2017 psychotherapy session, plaintiff reported to Ms. Porterfield-Spurling that he continued to experience family tension and verbal and emotional abuse. Plaintiff stated he would eventually like to go back to work, but he has extreme difficulty in social situations.  He became tearful when discussing his nightmares about his military experience of seeing innocent people being burned on a bus.  Mental status examination revealed a labile, anxious, and sad mood; his affect was animated, although paranoid at times; and his speech was found to be pressured at times.  Ms. Porterfield-Spurling reframed some of plaintiff's high anxiety and paranoia as being a symptom of war.  Plaintiff at times projected situations that were not really occurring.  Coping mechanisms were discussed, including praying and focusing on helping his children.  (*Id*. at PAGEID 445-446).

On October 17, 2017, Ms. Porterfield-Spurling helped plaintiff process how his PTSD symptoms from his war exposure and paranoia was affecting his relationship with his spouse. (*Id*. at PAGEID 431).   The following week, plaintiff and his wife began couple's therapy with psychologist, Randall Wenker, Psy.D.  (*Id*. at PAGEID 429-431).  In December 2017, plaintiff and his wife reported difficulty with their relationship due to plaintiff's suspiciousness and his expressions of anger.  (*Id*. at PAGEID 423).  The barriers to care were identified as plaintiff's chronic psychiatric symptoms, extreme suspiciousness, limited insight, limited self-care, and negative thought patterns.  (*Id*. at PAGEID 422).

During a January 2018 session, plaintiff presented as "paranoid and violent."  (*Id*. at PAGEID 421).  Dr. Wenker noted, "[plaintiff] appears to rationalize his hurtful actions, assumes minimal to no responsibility for his behavior, believes spouse is the primarily one in need of

14

change." (*Id*. at PAGEID 421). The following month, during a couple's therapy session, Dr. Wenker reported plaintiff was paranoid, believing his wife was having an extramarital relationship and suspicious of vehicles passing their home. He would get angry and yell. (*Id*. at PAGEID 402). In March 2018, the couple reported improvement and that plaintiff had no "blow ups" since the February counseling session. (*Id*. at PAGEID 398-399). When seen on April 3, 2018, plaintiff and his wife were calm and in no acute distress. (*Id*. at PAGEID 394). Plaintiff however did report a recent incident where he punched holes in the wall and broke one of his wife's possessions. (*Id*. at PAGEID 395).

On April 24, 2018, Dr. Wenker reported that plaintiff and his wife were in "moderate emotional distress." (*Id*. at PAGEID 391). Plaintiff's wife reported the last several days as being highly difficult, a "red flag week" for her, particularly in the mornings, i.e., they go to bed calmly, supportive, and lovingly, then over the course of several mornings plaintiff progressively becomes more irritable, rude, accusatory, yelling, and inappropriate including pulling the covers and blankets off of her. Plaintiff disagreed with her about some of the minor aspects of her report. Financial stresses appeared to contribute to the distress in the mornings. (*Id*.). Dr. Wenker found that plaintiff had limited insight about how he contributed to the marital problem and defended himself against criticism. (*Id*. at PAGEID 393). Dr. Wenker "highly encouraged" plaintiff to see a psychiatrist and attend mindfulness classes but he refused. (*Id*. at PAGEID 393-394). In May 2018, plaintiff and his wife reported they were doing better. However, plaintiff had recently lost his temper verbally at a repair shop, but he did not allow the situation to escalate into violence. (*Id*. at PAGEID 389).

In updating plaintiff's mental health treatment plan in June 2018, the social worker reported that plaintiff had chronic symptoms of extreme suspiciousness, limited self-care, limited insight, and negative thought patterns.  He had trauma-related symptoms including sadness, anxiety, and anger.  Plaintiff continued to have trust issues with his wife and difficulty coping with anger.  (*Id*. at PAGEID 383-386).  On mental status examination, plaintiff was found to have a normal mood, affect, memory, and insight.  (*Id*. at PAGEID 387).  He said that his anger negatively impacted his social and occupational life but reported he was making progress.  (*Id*. at PAGEID 387-388).

Other than the one-sentence conclusory assertion that plaintiff's treatment records showed improvement with therapy, the ALJ did not point to any specific evidence, or any specific treatment records, to support her conclusion for discounting Dr. Groneck's opinion. While plaintiff reported doing better on occasion, the therapy records, when viewed in their entirety, are not indicative of overall improvement such that the severe mental health symptoms identified by Dr. Groneck had subsided.  As such, the ALJ's reliance on supposed isolated statements in plaintiff's treatment records to reach the conclusion that plaintiff's symptoms were improving, was in error.  *See Boulis-Gasche*, 451 F. App'x at 494.

Second, the ALJ discounted Dr. Groneck's medical opinions on the basis that plaintiff's "symptoms had been present for many years and that he worked skilled jobs, in management positions despite these symptoms."  (Doc. 7 at PAGEID 72).  The ALJ stated that plaintiff was able to maintain employment for many years "despite indications that his mental health symptoms had been present since the mid-1990's."  (*Id*. at PAGEID 65).

Whether the ALJ's reason is substantially supported depends on whether plaintiff's symptoms at the time he worked in skilled management positions was equivalent in severity to the severity of his symptoms after his alleged onset date of disability.  One of the skilled management positions on which the ALJ relied for her conclusion ended in 2004, some 12 years prior to plaintiff's alleged onset date of disability of March 14, 2016.  Specifically, following his honorable discharge from the military in 1995, plaintiff was the general manager and operations director for Smart Route Systems until 2004 when the company was "bought" out.  (*Id*. at PAGEID 84, 87-88).  Plaintiff testified, and the record reflects, that Smart Route Systems was the longest term of employment that he held following his honorable discharge from the military.  (*Id*. at PAGEID 87, 117-18, 218-20, 244).

The only other "management" position plaintiff held was for three to four months as a "trainer" at a call center before he left because of a disagreement with management and being overwhelmed.  (*Id*. at PAGEID 85-87, 330).  Prior to this position, plaintiff held a laborer position for six months, sales representative position for five months, telemarketer position for seven months, and another sales representative position for eight months.  The evidence shows that plaintiff left these positions because of disagreements and frequent arguments with co-workers, "run-in['s]" with management, and "significant social problems" and interpersonal conflicts.  (*Id*. at PAGEID 87, 89, 330, 332-33, 500).

The ALJ's reliance plaintiff's relatively long-term management employment, which occurred 12 years prior to plaintiff's alleged onset date, to discount Dr. Groneck's medical opinions is without substantial support in the record.  During this time period, plaintiff's PTSD

17

"wasn't really that bad" because he "was so busy with raising kids" and "having a new job."  (*Id*. at PAGEID 92).  Plaintiff's mental health symptoms did not worsen until his mid-30's and 40's and continued to deteriorate in the four years prior to his March 2016 disability onset date.  (*Id*.). There is no evidence that the severity of plaintiff's symptoms from 1995 through 2004, the time period when plaintiff held his management position with Smart Route Systems, were equal in severity to the symptoms plaintiff experienced in 2016 and thereafter.  Instead, as discussed above, the record supports plaintiff's testimony that his symptoms deteriorated over time and adversely affected his ability to maintain employment.  Accordingly, the ALJ's factual finding that plaintiff worked skilled jobs in management positions despite the presence of his symptoms is not supported by substantial evidence in the record.  *See Hurst v. Sec'y of Health & Human Servs*., 753 F.2d 517, 519 (6th Cir. 1985) ("[F]ailure to consider the record as a whole undermines the Secretary's conclusion."); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980) ("Substantiality of the evidence must be based upon the record taken as a whole").

### b.  Dr. Walters' opinion

Plaintiff also asserts that the ALJ erred in evaluating the medical source opinion of Dr. Walters, the VA physician who assessed 100% disability based on PTSD.  (Doc. 12 at PAGEID 531).  Dr. Walters reported that plaintiff joined the Army in 1990 and saw combat in Saudi Arabia from December 1990 until March 1991.  (Doc. 7 at PAGEID 316).  Dr. Walters reported that plaintiff carried a PTSD diagnosis relating to being exposed to "small arms fire and rocket blasts" while in Saudi Arabia.  (*Id*. at PAGEID 317, 320).  Plaintiff was honorably discharged from the Army in 1995.  (*Id*. at PAGEID 316).  Dr. Walters opined that plaintiff has "total

occupational and social impairment as evidenced by his difficulty getting along with people, difficulty sleeping . . . irritability and anger outbursts, difficulty concentrating, and avoidance of public and crowded places." (*Id*. at PAGEID 320).

The Social Security Regulations provide that a determination of disability made by another agency such as the Department of Veterans Affairs is not binding on an ALJ. 20 C.F.R. § 404.1504. Nevertheless, the ALJ must consider all the evidence in the record in making a disability determination and "must at least consider a VA's disability decision and explain reasons for the weight she assigns to it." *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 310 (6th Cir. 2018) (citing *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 388 (6th Cir. 2013) (citing SSR 06-03p)).[6]

---

[6] The undersigned acknowledges that SSR 06-03p, which required that an "adjudicator should explain the consideration given" to a disability decision by another governmental or nongovernmental agency, was rescinded effective March 27, 2017. Nevertheless, the undersigned finds that the Ruling applies to plaintiff's claim, which was filed before the effective date of the rescission. The relevant Social Security regulation, which was revised on January 18, 2017, specifies that the revised regulation applies to claims filed "on or after March 27, 2017." 20 C.F.R. § 404.1504 (January 18, 2017). The regulations states:

> Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are blind or disabled under our rules. Therefore, in claims filed (see § 404.614) *on or after March 27, 2017*, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim. . . .

20 C.F.R. § 404.1504 (January 18, 2017) (emphasis added). As recently explained by one court:

> If the agency will not provide analysis of other agency decisions for claims filed *after* March 27, 2017, this Court can only conclude that the revised Rule requires the agency to provide such analysis for claims filed *before* that date. This conclusion is bolstered by the explanation given in the Notice of Rescission: "The final rules revised these policies [in SSR 06-3p] for claims filed on or after March 27, 2017. . . ." 82 Fed. Reg. 15,263-01. Again, the Court concludes that if the polices in SSR 06-3p were revised for claims filed *after* March 27, 2017, those policies remain in effect for claims filed *before* that date. The Court finds that, for applications filed before March 27, 2017, the

Here, the ALJ stated that she "gave some weight" to the opinion of Dr. Walters because "a finding of disability or a percentage of disability by the Department of Veterans Affairs measures a veteran's ability to return to and/or engage in combat." (Doc. 7 at PAGEID 73). The ALJ stated that "[w]hile the claimant's symptoms preclude him from returning to combat, . . . his limitations do not prevent any work activity." (*Id*.). The "reason" posited by the ALJ is inaccurate and unsupported by the federal regulations. The ALJ's reason for discounting Dr. Walter's opinion of disability is based on a false premise. The VA's disability percentage is based on the average impairment in earning capacity caused by service-connected disabilities, and *not* a veteran's ability to return to combat. *See* 38 C.F.R. §§ 4.10, 4.15; *Bird v. Berryhill*, 847 F.3d 911, 913 (7th Cir. 2017). The undersigned is therefore unable to discern the ALJ's evidentiary basis for discounting Dr. Walter's opinion, and the Court cannot conclude that the ALJ's decision in this regard is supported by substantial evidence. Plaintiff's assignment of error is well-taken.

Accordingly, for the above stated reasons, the Court sustains plaintiff's sole assignment of error with respect to the weight afforded to the medical source opinions of Dr. Groneck and Dr. Walters.

### III. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not

---

ALJ was required to consider the VA disability determination and explain the consideration given to that decision.

*Johnson v. Saul*, No. 3:18-cv-01106, 2020 WL 1329915, at *3 (M.D. Tenn. Mar. 23, 2020).

been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). This matter should be reversed and remanded for further proceedings with instructions to the ALJ to re-weigh the medical opinion evidence in accordance with this decision; to reassess plaintiff's RFC, giving appropriate weight to the opinions of Dr. Groneck and Dr. Walters, including an explanation on the record for the weight afforded to their opinions; and for further medical and vocational evidence as warranted.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: _12/23/2020_____

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHARLES N. SHAFOR,                                    Case No. 1:19-cv-860
      Plaintiff,                                Dlott, J.
                                                     Litkovitz, M.J.
      vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.


### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

22